We'll hear the next case, Natofsky v. City of New York. Why don't you just wait another moment until the courtroom finishes clearing. Okay. Good morning, and may it please the court. In this disability discrimination lawsuit, plaintiff appellant Richard Natofsky, who has a severe hearing disability, appeals the district court's grant of summary judgment to defendant City of New York. The district court improperly applied the standard on summary judgment. The court resolved disputes and inferences in the city's favor, analyzed evidence piecemeal, not as a whole, and ignored blatant disability animus towards Mr. Natofsky. Pagoda's testimony, or Pagoda's animosity, which is I think what the crux of your case is on the demotion claim is concerned. And then I think you're arguing that she was also responsible for the demotion. But it's boiled down to two situations, is that correct? One time when she first met him, and I think he has to speak a certain way, his method of communication is different from a hearing person because of his hearing problem, and also his hearing aids, and the fact that in order to understand a person, he has to look at them and read their lips as they're speaking, is that right? And he says, it's in the case, I guess, that she stared at him as a result of this situation. That's partially correct, Your Honor, but it was more than two incidents. The first incident, and this is very clearly laid out in our reply brief, the first incident is the first time she met Mr. Natofsky, she sat near him and was staring at his ears. The other incident was when he said, I need to close the door because I can't hear you, Ms. Pagoda would shake her head, roll her eyes, and on other occasions, Mr. Natofsky, as common with people with a speech disability, has to enunciate very clearly, and Ms. Pagoda was telling him, speed up, you need to speak faster, we're never going to get through everything we have to get through, and he would explain. He told her about his speech impediment, his hearing impediment at one point, right? Yes. And then was there testimony about her reaction to that? Ms. Pagoda implausibly and incredibly denies ever knowing that Mr. Natofsky had a speech hearing disability. He wore hearing aids, even Defendant Commissioner of DOI Mark Peters says, yes, he knew about the speech disability. It was apparent and obvious to everyone else in the record. That just goes to Ms. Pagoda's guilty state of mind that she so implausibly says, I never knew about it, and incredibly, after the demotion, we point to an email where Ms. Pagoda helped a subordinate of hers edit an email encouraging that subordinate to tell Mr. Natofsky, I don't know what, if anything, Ms. Pagoda knows about your hearing disability. So this is a supervisor who went out of her way to manipulate lower employees to deceive Mr. Natofsky, so a jury really needs to consider the way and manner in which Ms. Pagoda acted towards Mr. Natofsky, even in light of what the city calls reorganization. And we're confident that on this record, a jury, a rational trier of fact, can find that the overwhelming decision was based on the animus towards Mr. Natofsky that began in the very beginning of the relationship. When Mr. Coles, let me, I'm sorry, go ahead, Natofsky on the Rose Gill Hearn was director of human resources, right? Correct. And budget, your honor. Okay. And budget. He had two roles. Yes. Okay. More important, maybe, is the budget. Now, when a new administration comes in, isn't it the usual thing to reappoint people, to move people? Isn't that what always happens? Realistically? Yes. You're correct, your honor, but I would say. All right. Giving us that. Okay. As the budget director and as the head of human resources, shouldn't she have known how many people Peters would be able to hire when he takes office? She couldn't answer that question. I mean, that seems to me a key element of your job, to have that position. Well, Mr. Peters claimed this frustration, which you're referring to, only after the lawsuit was filed. When Mr. Natofsky was demoted, he was never told Mr. Peters was unhappy with him or there were any problems with the meetings. And Mr. Peters' testimony is, in fact- I got a rating of two out of five from Yulon, didn't I? Well, there's no evidence that Pagoda and Mr. Peters relied on Yulon's rating of Mr. Natofsky, and in fact, a few weeks earlier, on April 2nd, 2014, Ms. Pagoda told Mr. Natofsky in an email that said, come see me, nothing to worry about, and told him that Yulon's evaluations are flaky, she's trying to throw people under the bus, and you're going to keep one of your director positions. Now, Ms. Pagoda denies that. Had he gotten high ratings and a substantial award just shortly before all this? That's correct, Your Honor. In 2013, under the last administration, in the year that Ms. Pagoda says he needs improvement, Mr. Natofsky, unlike Yulon, got a merit increase in two awards. Now, the city points out that, well, one of the awards everyone got, but Mr. Natofsky was only one of three people in the entire agency that got the award for going above and beyond, and in fact, Ms. Yulon even admits in an email that the division of HR was severely understaffed, and Mr. Natofsky was wearing two hats, and even Ms. Pagoda in her testimony said, it was apparent to me that the HR and budget division were understaffed, that was obvious. What was the reason given by the defense here for his demotion? Was it reorganization or was it poor performance? The letter to Mr. Natofsky from May 20th says a reorganization, and then Mr. Natofsky complained and said, this is improper and illegitimate, and I was singled out, and he was referring to his disability, and when he was told it was reorganization, then Ms. Pagoda, when he challenged it, she wrote to an employee in a completely different agency and said, I'm thinking of confirming to Mr. Natofsky that this was a reorganization. What do you think? Now, if it was Peter's decision or even a legitimate business decision by Ms. Pagoda, she wouldn't need the help of someone outside of her agency to tell him what to say, and it was only after the lawsuit was filed that Mr. Peter suddenly had this vivid recollection of frustrations at a meeting, which is disputed because he's... The reason shifted. Yes, and the city says the reasons aren't inconsistent, but as we point out in the reply, we're saying they shifted from just a reorganization to now was you're a poor performer, but that was never told to Mr. Natofsky. A reorganization, and this is kind of a softball for you, a reorganization where the two people who were appointed for the two jobs, budget and what's the other, human resources, and so now there are two jobs, right, that are created. He didn't get either of those. He didn't. That's correct, Your Honor, and I also want... It's a small point, but I want to point out that the jobs were never merged officially with the city. Mr. Natofsky simply had two different titles, so he was doing the work of two people, and both the people put into those positions or assuming those duties were non-disabled. The district court actually correctly... If the reason was poor performance, I could see perhaps a demotion out of both of those positions, and maybe to the lower one that he got, but if the reason is reorganization and his poor performance was not the reason, then logically one would think he would get one of the two positions. Yes, absolutely, Your Honor, and then the pay cut was over 50%. He was making around $129,000, and he went down to the 60s, and Ms. Pagoda blames that on another city administrator, but if this was a legitimate decision, you would have said, wait a minute, how is this... It was also put into his former secretary's cubicle, right? Yes, that was incredibly embarrassing for Mr. Natofsky, and if I could... Why don't you finish your answer? Just finish up and just point out that the reorganization in this court, going back to Cronin for many years, you cannot violate the civil rights of an employee just because there's a reorganization, and that's what the city is just relying on, this magic wand of reorganization, but if you look at who was harmed, Mr. Natofsky was the only person that had a huge pay cut or a pay cut at all and a demotion. The only other person is Victor Olds, who was an older black man, and he was given the reorganization, and he was so high up that it's apples and oranges comparing him to Mr. Natofsky that's doing daily budget, so we think that the reorganization cannot mask how Ms. Pagoda obviously felt towards Mr. Natofsky. I know your red light is on, but I have a legal question that I would like to try and find out, because I'm a little confused about the causation element here as to whether or not your claim is that he was demoted solely because of the disability or whether there's a mixed motive option here. Your Honor, we say that under the Rehabilitation Act, consistent with the ADA, it should be but for causation. Yes, and we believe that the district court wrongly found that it should be solely, but if you look at the Rehabilitation Act... What's the difference between but for and solely? Well, solely... For but for, there can be multiple but for causes in a case, but solely seems to be a strange causal standard. We can't find any other case law or law that has solely, particularly in the employment context, so we're not entirely sure what solely means, but it seems to be a way of saying if there's a scintilla of evidence that it could have been any other reason but disability, he loses, and we say that 794D of the Rehabilitation Act says that the standards from ADA apply to determine if there's a violation in the employment context of the Rehabilitation Act, and but for should have been applied, and the court applied solely, which also stopped the court from applying bicker staff and cat's paw to find that Miss Pagoda could still be someone with a meaningful contribution to the decision-making. Does solely mean only? Solely seems to mean only, but it's an anomaly in the employment context, and the whole idea was to have ADA and rehab cases viewed together and analyzed together, and by having two distinct causal standards, which isn't supported by the clear face of the Rehabilitation Act in 794D, you end up with two completely different laws, and courts are struggling, even in this circuit, in the district court, to apply the differences, and we're asking this court to find that there is no difference. There's no actual holding by this circuit on this question, is there? No, we didn't find it, because even the city relies on Parker, which was from about 2000, I believe, and it's in the briefs. That court did not directly try to square Section 794D to explain how that section should be construed with the solely, which seems to be just the preamble to the beginning of the statute in Section A, but if you look at the much more specific Section of D, it says very clearly the standards of the ADA apply for a violation, so a violation can only be found if you're a causation, so clearly... Well, it seems to me that the ruling under the Rehabilitation Act is that it's generally solely by reason of, unless you have an employment discrimination case, and then you look to the ADA. Isn't that how you read 794A and D together? Yes, that it's solely can be for maybe if someone wants to go into a restaurant or get some public benefit, but when you're in the employment context, you go for the more specific part of the statute, which clearly says apply the ADA. So it's very clear that this should be but for causation. Well, my question is the ADA. A lot has happened. I mean, Congress actually modified the ADA rule in 2009, I believe it was, so before it was because of and then it was on the basis of, and I don't know what on the basis of means. There's some interpretation questions here, serious interpretation questions, which are novel to this court. Yes, and we pointed out in our brief that applying cat's paw to the Rehabilitation Act appears to be a question that hasn't been before this course. That's a whole different question. Yes. Let me decide it. You have some rebuttal. Yes, thank you. The other side. Good morning, Your Honors. May it please the Court. I'm Melanie West for the Appellees. After about a year and a half of working as the Director of HR and Budget at DOI, Mr. Natofsky was reassigned as part of a reorganization under new leadership. The record shows that several high-level employees, including Natofsky's immediate supervisor, were either reassigned or let go as part of this reorganization. And the record shows that this was because the new commissioner and his new chief of staff wanted to revamp the agency. Let me ask you this. Are you saying that there was no performance issue? No, Your Honor. I mean, I think the two are related. When there's a reorganization and employees are highly valued, they're kept on or put in similar positions. When they're not highly valued, I mean, it always plays into a reorganization. I'm not saying they're not mutually exclusive. And they are related to each other. So here we have undisputedly. Is there an issue of fact as to whether his performance was poor or whether that was pretext? Because just before this reorganization, he had gotten good evaluations, was making $120,000-something a year, and then suddenly he's bumped down to half the salary and put into his old secretary's cubicle. I mean, isn't that some evidence of pretext in terms of the performance argument? Not in the context of this case, Your Honor. The previous performance evaluations were under. A reasonable jury couldn't take the 50% cut in pay and putting him into a cubicle, particularly one where that was noisy. Could not construe that as evidence of animus and pretext? Well, a couple of things, Your Honor. So once Mr. Notofsky was removed from the managerial position, he reverted to his civil service range, which is set out in the rules. And once DCAS clarified what his salary was, that was adjusted. And with regards to the cubicle, again, Mr. Notofsky requested another cubicle, and he was moved to another cubicle. So, you know, yes, it is difficult to be reassigned to a lower-level position, but it's a logical step that someone who's no longer a manager would lose their office. And if you take that evidence with some of the other evidence, including the staring, the rolling of eyes, that kind of thing, is there not more evidence that a jury could rely on to find in his favor? I think it's important to go back and look at the testimony about those incidents of animus, Your Honor. So, first of all, the first incident was, you know, Mr. Notofsky says that, you know, Ms. Pogoda was staring at him and that she raised her voice and said to him, I'm speaking to you, why aren't you responding to me? According to his own accounts, these things happened before he ever disclosed to her that he had a hearing disability. In response to those, he said, I actually have a hearing disability, and then he says that as he turned and walked away, he saw her shaking her head and rolling her eyes. He wore hearing aids, right? Yes, Your Honor, but I'm... Will the jury not conclude that based on that fact alone, she must have known that he had a hearing disability? I don't believe so, Your Honor. I mean, there's no evidence... You don't believe so? I don't believe so. Some hearing aids are very discreet and difficult to see, and there's simply no, you know, there's... What kind of hearing aids he had? I don't know, Your Honor, and there's no evidence in the record of that. There's nothing in the record about that. But I ask you this, when the reorganization occurred, when the new administration comes in, who else and how many other people were demoted? So it's a handful of people at the top of the organization. So the most analogous is Mr. Notovsky's immediate supervisor, and throughout the record you can see that both of these individuals were sort of assessed together by Peters and Pagoda and found to be lacking. And Ms. Ulan was offered a position at a different agency that would have been a 20% reduction in salary. She chose not to take that, and therefore, you know, she didn't actually have a reduction in salary, but that was the offer that was made. She left the government? She left, yes. Another individual was the first deputy commissioner, which is, you know, a higher position, and he was not offered a different position. He was given a limited period of time before he had to leave, and he did leave. And these things, as not only Peters but also the previous commissioner, Gil Hearn, both testified this is common when there's an administration change, when there's a new commissioner. It's understood. I can understand that you replace the first deputy if you come in and you're the commissioner. You want your own first deputy. That makes sense. But let me ask you this. Who else was demoted? I mean, as I listened to you, you've named two people, but you told me in the beginning I think you said there were six. No, Your Honor. I believe the record is there was four. There was Maria Mastaggio, who was moved to a different agency, Victor Olds, the first deputy commissioner, who was let go, and Ulan Netovsky's immediate supervisor, who was also effectively let go when she chose not to take the reduced salary position that was suggested to her. And the record also shows that Peters says that when he brought in Pagoda as his chief of staff, he wanted her to revamp the agency with a particular eye to the administrative branch, and both of them believed that the HR and budget functions in particular needed reorganization, first because they thought it was inappropriate for one person to be handling both portfolios, but also because, and the evidence, you know, the record shows that they believed that the forms that were being used were outdated and confusing and there was a lot of work to be done. As Your Honor noted, at the first meeting with Peters, and it's undisputed that there was at least one meeting, they were unable to answer basic questions about how many vacancies there were in the agency, how many people he would be able to hire. This is, you know, to be expected that at the first meeting with a new commissioner, these would be the queries. And it's understandable under those circumstances that Peters walked away from that meeting feeling that these individuals were not competent. And that's, of course, a subjective assessment. The defendant's position has been that it was Peters who made the decision. Correct, Your Honor. Is that an issue of fact for a jury, whether it was his decision or whether Pagoda influenced him? So first of all, Your Honor, you know, plaintiffs agreed in their local 56.1 statement below that Peters was the ultimate decision maker, and a lot of the evidence about... Well, that may be, but did Pagoda influence his decision? The record shows that Peters had, Peters' testimony shows that he felt he was the ultimate decision maker and that he had an independent reason, you know, regardless of what consultations... Did he have a discussion or a conference before he made that decision? Well, he says that he discussed it with Pagoda, but he also says that he was frustrated with Natovsky's performance. He believed that the portfolios should be separated. And, yes, and... But, you know, a discussion with Pagoda could lead to him demoting Natovsky and then, you know, thinking of why he was going to do that and coming up with a reason. Well, Your Honor, we would say, you know... If she said, he's got to go, and I think he's got to go, he can't stay here, period, and then Peters decided, said, okay, and then came up with the reason that he did... But that's not reflected in his testimony. But I don't know at this stage whether there's any, you know, what happened at that meeting. Do we know that? I mean, was there evidence about what happened at that meeting? No, Your Honor, just that he discussed it with Pagoda. And I'll point out that a lot of the evidence... Isn't that enough for a jury to conclude that Pagoda influenced his decision? Your Honor, we would say that even if Pagoda was a joint decision-maker, there's not, you know, evidence of animus on the basis of Mr. Natovsky's disability sufficient to raise a question here. And I'll just point out quickly that a lot of the evidence regarding who made that decision is outside of the record. It was filed as a supplemental appendix with a motion to supplement the record, and there's simply no basis to allow that motion. We have that motion pending, which we have not decided to... I understand, Your Honor. The question I have is that prior history under the previous administration, the Bloomberg administration, where he was positive appraisals and also was given an award for going above and beyond the call of duty, which was only given to three people. Is it your position that that is inadmissible? That it would be inadmissible at a trial? No, Your Honor. If that would be admissible, it could be considered by the fact finder, could it not, on the issue of pretext? Yes, Your Honor, but the case law is clear that when employers change, it's of limited relevance that a previous employer thought highly of an employee. And I will point out that while Mr. Natovsky was one of three to receive that particular... the purported new performance problems are pretext. Not in the context of this case, Your Honor, where there was a massive change at the agency. After 12 years, a new commissioner came in, and multiple people were either moved around or let go. And the fact that a previous commissioner... And it's not suddenly, Your Honor. He had problems with his immediate supervisor, even under the previous administration. Commissioner Gilhern testified that she thought he was a good employee. The other question is reasonable accommodation. I mean, whether the purported performance issues are affected by the failure to reasonably accommodate his disability, including, for example, being a little more patient with him when they were having a discussion. Well, the only failure to accommodate claim is that, you know, there was a... his immediate supervisor, Ulan, in the previous administration had asked him to be more responsive in terms of responding to e-mails. Mr. Notovsky said he had difficulty responding to e-mails while he was in meetings. There is simply no suggestion that she was talking about responding to e-mails while he was in meetings. He suggested that if a matter was urgent, people could contact his secretary. That doesn't... that's not a request for accommodation, but in any event, you know, it was one of... it was only one of many factors laid out in his negative evaluation. What do you make of Pagoda's statement after Ulan left that he was doing a great job and that he was free now to spread his wings or whatever she said? I mean, it's difficult to square, Your Honor, with the other allegations of what she said and her apparent continual animus towards him from the first time she ever met him. You know, I mean, to the extent that she said that, she obviously reassessed. But there's nothing else in the record that supports that view. We have e-mails from day one of her saying that she considered both Ulan and Notovsky to be clueless. And, you know, in Mr. Notovsky's own testimony is that she... You made that determination on day one? Well, after the first time she met them, she said they appeared to be clueless based on a meeting where they couldn't answer her questions. All right. Thank you. We'll hear the rebuttal. Thank you. Just picking up where we left off here at the end, how do you square, spread your wings with everything else in the case? The simple answer is when you're a supervisor and you're not telling the truth and you don't have a genuine reason to demote someone, your story goes all over the place. And I think that's for the jury to consider. Now, the claim was who's the decision-maker? The city's still trying to argue that it was really Peters. But the city has already conceded in their briefs and in the documentation that the decision was determined by Pagoda and Peters approved it. So as Your Honors were just discussing, we don't know what happened in that meeting between Pagoda and Peters, but it appears construed in Mr. Notovsky's favor that it was simply a formality. It was a rubber stamping of what Ms. Pagoda had decided. And Mr. Peters' problems that he said— I'm surprised there was no evidence on this. It was taken during the discovery phase. Oh, yes. Mr. Peters and Ms. Pagoda were directly asked, what did you talk about? But they're each, we believe, and I think a jury can find, they're each covering for the other person. In a deposition transcript page that's outside the record and we're asking to supplement, Ms. Pagoda was asked, was Mr. Peters involved? And she said, I believe so, yes. So she's hedging. Why would you hedge about whether he's even involved if now you're claiming it was his decision? So we think that's rather odd. And so they wouldn't tell us really or testify to what was discussed. Mr. Peters would only answer in his deposition that Ms. Pagoda was doing the day-to-day management of this and it was determined by her and he ultimately approved it. So he said, therefore, it's my decision, which we think is really just semantics. And it was clearly Ms. Pagoda's decision, even if you look at what Mr. Peters said. And that's just a matter of an agency formality that the top person in an agency structure has to sign off on something that's determined by someone else. Is there any evidence in the record the negative performance review that he received from his supervisor was given because of his disability? Is there any evidence of that in the record? Yes, Your Honor. What is the evidence? The evaluation from Ms. Ulon? The two out of five. Yes. The evidence is that Ms. Ulon in the prior administration never criticized Mr. Notofsky's performance until Mr. Notofsky went to DOI Commissioner Rose Gilhern and said, Ms. Ulon has these rules, like I have to come to work at 10 o'clock, I can't come in earlier in the day, and I don't like these rules and they're affecting me. And so then Rose Gilhern sat down with Ulon and discussed that and said you need to consider his disability. And even Ms. Ulon acknowledges and admits that Rose Gilhern discussed Mr. Notofsky's disability. And then after that complaint, which can be construed as a complaint, suddenly the next performance evaluation is negative when before he hadn't had anything negative. The old logical fallacy, post hoc ergo propter hoc. You're saying it happened after, therefore that's what caused it. Is there any evidence? There's no evidence that what Ms. Ulon is complaining about Mr. Notofsky suddenly happened. It wasn't documented contemporaneously after he complained to her. Is it your position that Ulon had it in for Notofsky after she had made the recommendation and then he objected to it, it went to her superior and she was reversed on that and therefore she had some animosity towards him? Yes, Your Honor, and we believe the record supports that because one of Ms. It was an inference, I suppose. Yes, if I could give one start example. The rule that Mr. Notofsky is a very diligent, disciplined employee. He came in earlier, no extra pay. He would come in very early in the morning and Ulon said she had about five subordinates and she said just Mr. Notofsky has to come in at 10 o'clock. I mean it's just unheard of that an employer says you have to come in later when they come in earlier and the reason Mr. Notofsky came in earlier is because he is hearing impaired. He needs to organize and settle himself for the day because he performs at a high level but he has to work that much harder than normally abled individuals. So just out of sheer animosity towards Mr. Notofsky's disability, she said, guess what, you can't come in at 830, you've got to have to come in at 10 a.m. when I come in and there was no justification at all for that. I mean the only thing would be to harm someone with a disability and when Mr. Notofsky challenged her in an email, she said it's procedural needs of the organization or something like that and she wouldn't articulate why are you essentially punishing me and making every day of my life more difficult by forcing me to come in later when I came in early with no pay and we think a jury is going to be highly persuaded for them and it's appropriate for a jury to hear that. Thank you. Thank you very much. We'll reserve the session.